Filed 10/12/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>AKEEM SIMMONS,<br><br>    Defendant and Appellant. | 2d Crim. No. B309921<br>(Super. Ct. No. BA468709)<br>(Los Angeles County) |

The Racial Justice Act (RJA) seeks to eliminate racism from criminal trials in California. Here we decide the RJA does not violate article VI, section 13 of the California Constitution. We acknowledge the dissent's cogent argument that the RJA violates article VI because section 13 states that it is the province of the court to decide whether an error results in a miscarriage of justice. We are hopeful, indeed confident, that our Supreme Court will resolve this issue … soon.

Akeem Simmons appeals his conviction, by jury, of the attempted willful, premeditated, and deliberate murder of Danny

Graves (Pen. Code, §§ 187, 664)[1] and fleeing a pursuing peace officer's motor vehicle while driving recklessly. (Veh. Code, § 2800.2.) The jury further found appellant personally used a handgun in committing the attempted murder. (§ 12022.53, subds. (b), (c).) It acquitted appellant of a second count of attempted murder on the same victim. The trial court sentenced appellant to life in prison plus a 20-year enhancement term for the firearm use and a concurrent term of 27 months on the evading conviction.

Appellant contends that numerous evidentiary, procedural, and instructional errors occurred at his trial. Of primary interest to us is the contention that the prosecutor violated the RJA, section 745, during her cross-examination of appellant and her rebuttal closing argument, and that his counsel was ineffective for failing to raise the issue at the sentencing hearing, which was held after the effective date of the RJA. Respondent concedes the prosecutor's rebuttal argument violated section 745 and that defense counsel rendered ineffective assistance. We agree. The judgment is reversed and the matter remanded to the trial court for further proceedings as mandated by the RJA.

*Facts*

Danny Graves, a nightclub disc jockey and middle-man supplier of marijuana, sold several pounds of marijuana to appellant on a couple of occasions in late 2017 and early 2018. He considered himself to be a friend of appellant's, whom he called "Red." The two socialized at Graves's house and appellant stayed overnight there at least twice.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

Appellant lived and worked as a barber and marijuana seller in and around Philadelphia, Pennsylvania. He frequently traveled to Los Angeles to buy drugs. While in Southern California, appellant would also socialize with friends and meet and date women.

When appellant bought marijuana from Graves and others, the seller would package it and send it to an address in the Philadelphia area provided by appellant. In late 2017 or early 2018, appellant gave Graves $10,000 for marijuana. Graves gave the money to another supplier who failed to deliver the marijuana to Graves. As a result, Graves could not send appellant the marijuana or return his cash. He called appellant and explained the situation. Within a few weeks, Graves mailed appellant 22 pounds of marijuana.

The First Shooting.

At about 11:00 a.m. on March 25, 2018, Graves was backing his pickup truck out of his driveway when he saw appellant pull up next to him in a smaller white SUV. Appellant got out of the SUV and pulled a handgun from his pocket. Graves testified that the look on appellant's face told him that appellant "came with a mind to do something." He decided to "just drive off for [his] safety." Through his rear view mirror, Graves saw appellant stand in the middle of the street and shoot at Graves's truck. Appellant fired seven shots. There were holes in the side of the truck, the back window, and the seats, but Graves himself was not injured.

Graves identified appellant as the shooter to the responding police officer and later to the investigating detective. The police recovered several casings from a .45 caliber gun. Footage from neighbors' surveillance cameras captured the

3

incident, but the shooter's face was obscured by a truck parked on the street. Another neighbor testified that she looked out her apartment window when she heard the gunshots. She saw someone standing in the street whom she described as "fair-skinned" and of "medium-build." She did not see the person's face.

The Second Shooting.

In the early morning hours of May 19, 2018, Graves was standing outside his house when he was confronted by three men, one of whom pointed a gun at his face. Graves scurried to take cover under a van that was parked in the driveway. He felt and heard several shots. Graves yelled for help. The shooter and accomplices fled. Graves, who had been shot four times, was transported to the hospital. He identified appellant as the shooter. Graves later confirmed the identification when the investigating detective showed him a photograph of appellant. Portions of this incident were also captured on surveillance video but the images were not sufficient by themselves to identify the shooters.

A Los Angeles police department criminalist testified that, based on an analysis of casings recovered after each shooting, one gun was used in the March 25 shooting and two guns were used in the May 19 shooting. All the recovered casings were .45 caliber. One casing from the May 19 shooting matched the casings found on March 25. The criminalist concluded that the same gun was used in both shootings.

The jury found appellant not guilty of attempted murder in connection with the May 19 shooting.

4

<u>Appellant's Arrest</u>.

Between the two shootings, Graves received phone calls from a Pennsylvania number but did not speak to the caller. Detective Soto, the investigating detective, obtained a search warrant for that number and tracked the phone to an apartment on Serrano Avenue in Los Angeles. When Soto arrived at the address, he saw a person matching appellant's description sitting in a car outside the apartment. The car drove off when Soto walked toward the apartment door. Geolocation tracking showed that the phone was moving away from the apartment, in the same location as the car was headed.

Los Angeles police officers began surveillance of the Serrano address. In early June 2018, an officer saw appellant leave the building and get into a gray BMW. He called for backup and several marked police cars began following the BMW. Appellant eventually pulled over but then drove off at a high rate of speed. After crashing his car, appellant jumped out and ran. He was arrested shortly thereafter. Appellant had a New York driver's license and a Social Security card in the name of "Kevin Husband." Paperwork found inside the BMW listed its owner as Kevin Husband and mail addressed to that name was also found at the Serrano address. Multiple cell phones were recovered from the BMW.

<u>The Serrano Avenue Apartment</u>.

Ladana Tate rented the apartment on Serrano Avenue where appellant was seen and where "Kevin Husband" received mail. After appellant's arrest, she gave a recorded interview to Detective Bellows. Tate told Bellows that appellant had been her boyfriend since March and that he sometimes used the name Kevin Husband. She knew appellant was from Pennsylvania and

5

that he frequently traveled to Los Angeles. He stayed at her place "weekly" from March 2018 to June 2018. Tate told Bellows that appellant sold drugs and that he "had issues" with someone who owed him money. She believed appellant wanted to confront that person because appellant had a gun. At some point, appellant asked to borrow her Honda Accord to conduct "surveillance" on this person. She agreed to swap cars with him.

Tate told Bellows that she became pregnant by appellant in March 2018 and had an abortion. This caused problems in their relationship. Tate was also aware that appellant was seeing other women. They did not speak for a few weeks after the day they switched cars.

In her trial testimony, Tate denied most of the statements she made to Detective Bellows and even denied recognizing her voice on the recording of the interview.

Appellant's Trial Testimony.

Appellant testified and denied any involvement in either shooting. He claimed to have met the victim, Danny Graves, through a mutual friend, "Pops." Graves sold quantities of methamphetamine and cocaine to Pops. Appellant believed he and Graves were friends. They spent time together at Graves's house and at the nightclub where he worked. In October 2017, he was with Graves when Graves got into a confrontation with someone who then "pulled out a gun and started shooting at him."

Appellant and Graves had a falling out after he gave Graves money for marijuana that Graves could not deliver. After Graves sent him 22 pounds of marijuana, appellant considered their business concluded and found another marijuana supplier.

6

Appellant testified that he always had at least two cell phones: one for friends and family and one for business. He changed the business phone number monthly. Appellant never had the Pennsylvania number the police were investigating.

Appellant denied telling Tate that he needed to surveil Graves. He asked to borrow her car because he wanted to keep tabs on someone else who owed him money. He and Tate "hooked up" a few times. They broke up because appellant did not believe he was responsible for Tate's pregnancy and did not want to pay for it. She also was not happy that appellant was seeing other women.

During a lengthy and disjointed cross-examination, the prosecutor seemed to focus on appellant's relationships with women, the people and places he visited while in California, and his use of a false name to buy a car and make airline reservations, rather than on his relationship with Graves or the circumstances of either shooting. She mentioned on many occasions that appellant is a "light-skinned" Black man and asked him to compare his skin tone to that of other people mentioned in his testimony.

For example, when the prosecutor asked appellant to describe "Pops," the mutual friend who introduced appellant to Graves, she asked whether Pops was "dark-skin or light-skin like [appellant]." Appellant answered, "He's brown skin. Not dark. But not as light as I am." The prosecutor again asked, "Darker than you?" Appellant confirmed that Pops was "[d]arker."

Similarly, appellant testified that the man who shot at Graves in October was "light skinned." The prosecutor asked appellant to confirm that he was also light skinned and that

7

"[s]ometimes people mistake you for something other than Black." Appellant answered "Sometimes."

"[Carrion]: Sometimes people mistake you for maybe even white, right?

"[Appellant]: No. Never white."

The prosecutor responded by speculating, "It's pretty safe to say that there are all kinds of people mistaking you for something other than Black; right?" Appellant replied that sometimes people who did not know him would mistake his race.

The cross-examination of appellant also focused on four women he met in Southern California during the months before the shootings. There was no evidence any of these women were involved with the victim or with either shooting. The prosecutor asked detailed questions about where appellant met each woman, how many times he saw them, and when he stayed at their apartments. Appellant testified that, during one trip to Los Angeles in February, he spent the entire weekend at Tate's apartment. The prosecutor asked, "Were you trying to be charming with Ladana too?" Appellant replied, "I always try to be charming."

Prosecutor's Closing Arguments.

During both her closing and rebuttal arguments, the prosecutor told the jury that appellant was not credible and lied whenever it was convenient for him, even to people, like the victim, who trusted him. "You know who else trusted him? Numerous women that agreed to go out with him. That he lied to. And numerous other people that he did business with."

Repeating the theme later in her argument, the prosecutor described appellant as having been "so charming yesterday." "I'm sure he was just as charming with all the women that he's

8

coached into bed while he was roaming the streets of Los Angeles in 2017 . . . ." She pointed out that he refused to answer many questions, claimed not to remember other facts, and changed his answers on other occasions. "He lied to you. He tried to bat his eyes and put on nice clothes and be charming the way he used to be charming with all of the other women and some of his business partners. . . . And the defendant even told you himself, 'I always try to be charming.' So I argue you should consider not believing anything he says."

The prosecutor concluded her rebuttal argument by reminding the jury that, when appellant was on the stand, he "talked his smooth talk that he uses, I'm sure, with the ladies and that he uses, I'm sure, with new clients. He told you how he always tried to be charming. He bragged about all the women he was able to fool with his good looks, and he admitted to having an ambiguous ethnic presentation and that people that don't know him think he's something other than Black."

On November 13, 2019, the jury returned its verdicts convicting appellant of the March 25, 2018, attempted murder and finding him not guilty of the May 19, 2018, attempted murder. It also found appellant guilty of fleeing a pursuing peace officer's motor vehicle while driving recklessly, in violation of Vehicle Code section 2800.2. Appellant's probation and sentencing hearing was continued until January 4, 2021, in response to the COVID-19 pandemic and to permit newly retained defense counsel to file a motion for new trial.[2] The

---

[2] The motion for new trial, attachments, and any written opposition to it could not be located by the Clerk of the Superior Court and for that reason are not included in the record. The

motion for new trial and the sentencing hearing occurred on January 4, 2021, three days after the effective date of the RJA. Appellant's counsel did not mention the RJA at the hearing.

*Contentions on Appeal*

Appellant contends the prosecutor violated the RJA (§ 745) by repeatedly referring to his skin tone, suggesting that he could be mistaken for being Hispanic or "even white," and arguing that he was deceptive and not a credible witness because he had an "ambiguous ethnic presentation." In addition, appellant contends the prosecutor's many questions and comments about his relationships with women and "charming" personality also had a racist tone. Respondent concedes the comments regarding appellant's ambiguous ethnic presentation violated the RJA, but contends the comments regarding his relationships with women were proper commentary on his credibility.

Appellant contends numerous other errors occurred at his trial. Because the RJA violation is dispositive, however, we do not address those contentions.

*The RJA*

In enacting the RJA, our Legislature found and declared, "Discrimination in our criminal justice system based on race, ethnicity, or national origin (hereafter 'race' or 'racial bias') has a deleterious effect not only on individual criminal defendants but on our system of justice as a whole. . . . Discrimination undermines public confidence in the fairness of the state's system of justice and deprives Californians of equal justice under law." (Assem. Bill No. 2542 (2019-2020 Reg. Sess.) § 2, subd. (a) (hereafter Assem. Bill No. 2542).) The Legislature found that,

---

record does, however, include the reporter's transcript of the hearing on the motion.

while racial bias is "widely acknowledged as intolerable in the criminal justice system," it persists because "courts generally only address racial bias in its most extreme and blatant forms." (*Id.*, subd. (c).) In its view, current law "is insufficient to address discrimination in our justice system. [Citations.] Even when racism clearly infects a criminal proceeding, under current legal precedent, proof of purposeful discrimination is often required, but nearly impossible to establish." (*Ibid.*) The legislative findings provided several examples of cases in which trial and appellate courts have tolerated racist testimony from expert witnesses, racial bias exhibited by defense counsel and the use by prosecutors of "racially incendiary or racially coded language, images, and racial stereotypes," including "cases where prosecutors have compared defendants who are people of color to Bengal tigers and other animals, even while acknowledging that such statements are 'highly offensive and inappropriate.'" (*Id.*, subd. (e).)

The Legislature's findings noted a "growing awareness that no degree or amount of racial bias is tolerable in a fair and just criminal justice system, that racial bias is often insidious, and that purposeful discrimination is often masked and racial animus disguised. . . . Examples of the racism that pervades the criminal justice system are too numerous to list." (Assem. Bill No. 2542, § 2, subd. (h).)

It then declared its intent "to eliminate racial bias from California's criminal justice system because racism in any form or amount, at any stage of a criminal trial, is intolerable, inimical to a fair criminal justice system, is a miscarriage of justice under article VI of the California Constitution, and violates the laws and Constitution of the State of California." (Assem. Bill No.

11

2542, § 2, subd. (i).)  The legislative findings note that it is not the intent of the Legislature to punish explicit or implicit racial bias, "but rather to remedy the harm to the defendant's case and to the integrity of the judicial system.  It is the intent of the Legislature to ensure that race plays no role at all in seeking or obtaining convictions or in sentencing.  It is the intent of the Legislature to reject the conclusion that racial disparities within our criminal justice are inevitable, and to actively work to eradicate them."  (*Ibid.*)  The Legislature also declared its intent to "eliminate racially discriminatory practices" in the system and to provide individual defendants with "access to all relevant evidence, including statistical evidence, regarding potential discrimination in seeking or obtaining convictions or imposing sentences."  (*Id.*, subd. (j).)

To accomplish this goal, subdivision (a) of section 745 provides, "The state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin.  A violation is established if the defendant proves, by a preponderance of the evidence, any of the following:  [¶] (1) The judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin.  [¶] (2) During the defendant's trial, in court and during the proceedings, the judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror, used racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful.  This paragraph does

not apply if the person speaking is relating language used by another that is relevant to the case or if the person speaking is giving a racially neutral and unbiased physical description of the suspect." (§ 745, subd. (a)(1),(2).)[3] The statute defines "racially discriminatory language" as language that, "to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language, language that compares the defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin. Evidence that particular words or images are used exclusively or disproportionately in cases where the defendant is of a specific race, ethnicity, or national origin is relevant to determining whether language is discriminatory." (*Id.*, subd. (h)(4).)

To raise the question of whether section 745 was violated during a criminal proceeding, the defendant "may file a motion in the trial court," a petition for writ of habeas corpus, or a motion under section 1473.7.[4] (§ 745, subd. (b).) "If a motion is filed in the trial court and the defendant makes a prima facie showing of a violation of subdivision (a), the trial court shall hold a hearing." (*Id.*, subd. (c).) Either party may present evidence at the hearing. (*Id.*, subd. (c)(1).) "The defendant shall have the burden of

---

[3] A violation of the statute may also be established if the defendant was charged with or convicted of a more serious offense, or received a more severe sentence, than similarly situated defendants of other races, ethnicities, or national origins. (§ 745, subd. (a)(3), (4).) These subdivisions are not at issue here.

[4] A motion in the trial court "shall be made as soon as practicable" and "may be deemed waived, in the discretion of the court," if not made in a timely manner. (§ 745, subd. (c).)

13

proving a violation of subdivision (a) by a preponderance of the evidence. The defendant does not need to prove intentional discrimination." (*Id*., subd. (c)(2).) At the conclusion of the hearing, the trial court must make findings on the record. (*Id*., subd. (c)(3).)

If the trial court finds that a violation of section 745, subdivision (a), has occurred, the statute requires it to impose one of the remedies identified in the statute. Subdivision (e) provides:

"Notwithstanding any other law, except . . . for an initiative approved by the voters, if the court finds, by a preponderance of evidence, a violation of subdivision (a), the court shall impose a remedy specific to the violation found from the following list:

"(1) Before a judgment has been entered, the court may impose any of the following remedies:

"(A) Declare a mistrial, if requested by the defendant.

"(B) Discharge the jury panel and empanel a new jury.

"(C) If the court determines that it would be in the interest of justice, dismiss enhancements, special circumstances, or special allegations, or reduce one or more charges.

"(2)(A) After a judgment has been entered, if the court finds that a conviction was sought or obtained in violation of subdivision (a), the court shall vacate the conviction and sentence, find that it is legally invalid, and order new proceedings consistent with subdivision (a). If the court finds that the only violation of subdivision (a) that occurred is based on paragraph (3) of subdivision (a), the court may modify the judgment to a lesser included or lesser related offense. On resentencing, the court shall not impose a new sentence greater than that previously imposed.

14

"(B) After a judgment has been entered, if the court finds that only the sentence was sought, obtained, or imposed in violation of subdivision (a), the court shall vacate the sentence, find that it is legally invalid, and impose a new sentence. On resentencing, the court shall not impose a new sentence greater than that previously imposed.

"(3) When the court finds there has been a violation of subdivision (a), the defendant shall not be eligible for the death penalty.

"(4) The remedies available under this section do not foreclose any other remedies available under the United States Constitution, the California Constitution, or any other law." (§ 745, subd. (e).)"

The statute applies to "all cases in which judgment is not yet final." (§ 745, subd. (j)(1).)

*Discussion*

The parties agree that the prosecutor violated the RJA when she stated in her rebuttal argument, "[Appellant] bragged about all the women he was able to fool with his good looks, and he admitted to having an ambiguous ethnic presentation and that people that don't know him think he's something other than Black." We agree.

The RJA is violated when, "During the defendant's trial, in court and during the proceedings, . . . an attorney in the case . . . used racially discriminatory language about the defendant's race, ethnicity or national origin, . . . whether or not purposeful." (§ 745, subd. (a)(2).) Racially discriminatory language includes "language that references the defendant's physical appearance, culture, ethnicity, or national origin." (*Id*., subd. (h)(4).) The comment at issue here violates subdivision (a) because it equates

15

appellant's skin tone and "ethnic presentation" with deception, implying that he was not a credible witness because the color of his skin fooled women and confused strangers. The suggestion that a witness is lying based on nothing more than his complexion is as baseless as it is offensive. Section 745 targets precisely this sort of racially biased language.

The statute, however, also establishes an exclusive set of procedures for addressing violations of its terms. Subdivision (b) of section 745 provides, "A defendant may file a motion in the trial court or, if judgment has been imposed, may file a petition for writ of habeas corpus or a motion under Section 1473.7 in a court of competent jurisdiction, alleging a violation of subdivision (a)." There is no provision in section 745 for raising a violation of the statute for the first time on direct appeal.

Here, however, appellant contends he was denied the effective assistance of counsel because his counsel failed to bring the violation to the trial court's attention at the sentencing hearing, which occurred three days after the effective date of section 745. Respondent concedes defense counsel was ineffective in this regard and we agree.

To prevail on an ineffective assistance of counsel claim, appellant must satisfy the test established in *Strickland v. Washington* (1984) 466 U.S. 668. "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant [under] the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." (*Id.* at

16

p. 687; see also *People v. Ledesma* (1987) 43 Cal.3d 171, 215.) To satisfy the first part of the test, appellant must demonstrate that "counsel's representation fell below an objective standard of reasonableness." (*Strickland*, at p. 688.) To satisfy the second, appellant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694.)

The RJA violation at issue here occurred during the prosecutor's rebuttal closing argument, before the RJA took effect. Counsel should, however, have raised the issue at the first opportunity after the statute took effect, appellant's sentencing hearing. The failure to do so was both objectively unreasonable and prejudicial within the meaning of *Strickland*. Once a violation of the statute has been established, the trial court is required to "impose a remedy specific to the violation" from the list of remedies provided. (§ 745, subd. (e).) Imposing any one of the enumerated remedies would have changed the result of the proceeding. Accordingly, appellant has established that he received ineffective assistance of counsel because counsel failed to raise the RJA violation at his sentencing hearing.

The statute forecloses any traditional case-specific harmless error analysis. The Legislature's stated intent in adopting the RJA was "to eliminate racial bias from California's criminal justice system because *racism in any form or amount*, at any stage of a criminal trial is intolerable, inimical to a fair criminal justice system, *is a miscarriage of justice under Article VI of the California Constitution* and violates the laws and

17

Constitution of the State of California." (Assem. Bill No. 2542, § 2, subd. (i), italics added.)

Subdivision (e) of section 745 therefore provides that, once a violation of the RJA has been established, the trial court "shall impose" one of the enumerated remedies. The plain language of the statute thus mandates that a remedy be imposed without requiring a show of prejudice. As one treatise explains, "The Legislature's directive is clear: if the court finds a violation, a remedy *shall* be imposed, and the remedy *must* come from the list provided by the Legislature. The imposition of a remedy does not depend on a finding of actual harm or prejudice to the defendant's case." (Couzens, et al., Sentencing California Crimes (The Rutter Group, Aug. 2022) § 28:5, subd. (C)(1).)

We further note that, in 2022, the Legislature amended section 745 to add subdivision (k) which expressly allows for a prejudice analysis in a narrow class of cases. "For petitions that are filed in cases for which judgment was entered before January 1, 2021, *and only in those cases*, if the petition is based on a violation of paragraph (1) or (2) of subdivision (a), the petitioner shall be entitled to relief as provided in subdivision (e), unless the state proves beyond a reasonable doubt that the violation did not contribute to the judgment." (§ 745, subd. (k), italics added.) Subdivision (k) thus limits any analysis of individualized prejudice to cases in which judgment was entered before January 1, 2021. This is a strong indication that the Legislature did not intend a case-specific prejudice inquiry to be performed in cases, like this one, where judgment was entered after January 1, 2021.

Nor does the California Constitution require a case-specific prejudice inquiry. Article VI, section 13 of the California Constitution provides, "No judgment shall be set aside, or new

18

trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." The RJA represents the Legislature's express determination that "racism in any form or amount, at any stage of a criminal trial, is intolerable, inimical to a fair criminal justice system, is a miscarriage of justice under Article VI of the California Constitution, and violates the laws and Constitution of the State of California." (Assem. Bill No. 2542, § 2, subd. (i).) Article VI, section 13 does not prohibit the Legislature from making this presumptively constitutional determination.

To understand the interplay between the RJA and article VI, section 13 of the California Constitution, we begin with a fundamental principle of constitutional adjudication: "'Unlike the federal Constitution, which is a grant of power to Congress, the California Constitution is a limitation or restriction on the powers of the Legislature. [Citations.] Two important consequences flow from this fact. First, the entire law-making authority of the state, except the people's right of initiative and referendum, is vested in the Legislature, and that body may exercise any and all legislative powers *which are not expressly, or by necessary implication denied to it by the Constitution.* [Citations.] . . . Secondly, all intendments favor the exercise of the Legislature's plenary authority . . . .'" (*Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 180 (*Brown*), quoting *Methodist Hosp. of Sacramento v. Saylor* (1971) 5 Cal.3d 685, 691.)

19

Because the Legislature has the entire law-making authority of the state, any doubts concerning its power to act legislatively are resolved in favor of the Legislature's action. (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 254 (*Matosantos*).) The presumption of constitutionality is even stronger where the Legislature enacts a statute with the relevant state constitutional provisions in mind. "'Although the ultimate constitutional interpretation must rest, of course, with the judiciary [citation], a focused legislative judgment on the question enjoys significant weight and deference by the courts.'" (*Property Reserve, Inc. v. Superior Court* (2016) 1 Cal.5th 151, 192-193, quoting *Brown, supra*, 29 Cal.3d at p. 180.)

We further note that nothing in article VI, section 13 of the California Constitution prohibits the Legislature from defining certain errors as a miscarriage of justice. The constitutional provision empowers reviewing courts to assess the underlying facts of and procedures employed in each case to determine whether an error impacted the outcome. It also limits the court's power to set aside a judgment or order a new trial in the absence of a miscarriage of justice. (*People v. Blackburn* (2015) 61 Cal.4th 1113, 1139-1140 (conc. opn. of Liu, J.).)

But article VI, section 13 of the California Constitution does not limit, or even mention, the plenary law-making authority of Legislature. It has exercised that authority here to declare that racially discriminatory language used during trial constitutes a miscarriage of justice within the meaning of article VI, section 13. Because the state constitution does not limit the Legislature's power to define a miscarriage of justice, we must conclude it has properly exercised its authority to do so here. (*Matosantos, supra*, 53 Cal.4th at p. 254 ["We thus start from the

premise that the Legislature possesses the full extent of the legislative power and its enactments are authorized exercises of that power. Only where the state Constitution withdraws legislative power will we conclude an enactment is invalid for want of authority"].)

We have concluded that the Legislature acted within its law-making authority when it declared in the RJA that the use of racially discriminatory language in a criminal trial constitutes a miscarriage of justice, that the prosecutor violated the statute when she referred to appellant's complexion and "ambiguous ethnic presentation" as reasons to doubt his credibility, and that his counsel was ineffective for failing to bring this statutory violation to the attention of the trial court at the earliest possible opportunity. There remains the question of the proper remedy.

Subdivision (e) of section 745 provides that, once a violation has been established, the trial court "shall impose a remedy" from a list of possible remedies. Some remedies apply before a judgment is entered (*id.*, subd. (e)(1)); others apply after a judgment has been entered. (*Id.*, subd. (e)(2).) In addition, subdivision (e)(4) provides that the enumerated remedies "do not foreclose any other remedies available under the United States Constitution, the California Constitution, or any other law." (*Ibid*.) Because appellant's trial counsel failed to raise the violation at the sentencing hearing, the trial court has not yet had the opportunity to exercise its discretion to select which of the enumerated remedies it would impose. (*Id.*, subd. (e).) Consequently, we remand the matter to the trial court so it may exercise its discretion in this regard.

21

*Conclusion*

The judgment is reversed.  The matter is remanded to the trial court for further proceedings consistent with section 745 and this opinion.

CERTIFIED FOR PUBLICATION.


GILBERT, P. J.

I concur:


BALTODANO, J.

YEGAN, J., Dissenting:

The majority opinion upholds the Legislature's attempt to create an exception to the constitutional "miscarriage of justice" reversal requirement for violations of the California Racial Justice Act of 2020 (RJA).  (Assem. Bill No. 2542 (2019-2020 Reg. Sess.) Stats. 2020, ch. 317, § 1.)  As Justice Mosk said, "The Goddess of Justice is wearing a black arm-band today, as she weeps for the Constitution of California."  (*Brosnahan v. Brown* (1982) 32 Cal.3d 236, 299 (dis. opn. of Mosk, J.) (*Brosnahan*).) "[T]he mythical Goddess of Justice . . . is depicted [as wearing a blindfold] to illustrate her impartiality and freedom from external influences."  (*Fujii v. State of California* (1952) 38 Cal.2d 718, 739 (conc. opn. of Carter, J.).)

Justice Mosk noted: "James Madison, in the Federalist Papers (No. LXXVIII), wrote, inter alia, 'The interpretation of the laws is the proper and peculiar province of the courts.  A constitution is, in fact, and must be regarded by the judges, as a fundamental law.  It, therefore, belongs to them [the judges] to ascertain its meaning . . . .'"  (*Brosnahan, supra,* 32 Cal.3d at p. 298.)  But the majority opinion concludes that, as to violations of the RJA, it belongs to the Legislature, not the judiciary, to determine the meaning of "miscarriage of justice" in Article VI, section 13 of the California Constitution (section 13).  As I explain below, the majority's deferral to the Legislature violates the California Constitution's separation of powers clause.

The Attorney General and appellant agree with the majority opinion.  Therefore, it is unlikely that a party will file a petition for review in the California Supreme Court.  "If no petition for review is filed, the Supreme Court may, on its own motion, order review of a Court of Appeal decision . . . ."  (Cal.

Rules of Court, rule 8.512(c)(1).)  If neither party files a petition for review, I urge the Supreme Court to grant review on its own motion.

I respectfully dissent from the majority opinion's holding that section 13 does not "require a case-specific prejudice inquiry" where, as here, there is a violation of the RJA and judgment was entered after January 1, 2021.  (Maj. opn., *ante*, at p. 18.)  The majority concludes "that the Legislature acted within its law-making authority when it declared in the RJA that the use of racially discriminatory language in a criminal trial constitutes a miscarriage of justice . . . ."  (*Id*., at p. 21.)

Section 13 provides, "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."  "This test is not met unless it appears 'reasonably probable' the defendant would have achieved a more favorable result had the error not occurred."  (*People v. Breverman* (1998) 19 Cal.4th 142, 149 (*Breverman*).)  "[F]or over 100 years, the California Constitution has . . . expressly precluded reversal absent prejudice."  (*F.P. v. Monier* (2017) 3 Cal.5th 1099, 1107 (*Monier*).)  The Legislature may not enact a statute that amends the California Constitution.  "Wherever statutes conflict with constitutional provisions, the latter must prevail."  (*People v. Navarro* (1972) 7 Cal.3d 248, 260.)

"To be sure, even under . . . section 13, an error is reversible per se when it constitutes 'a "'structural [defect] in the

2

. . . trial mechanism'" that defies evaluation for harmlessness.' ([Citation]; see *People v. Anzalone* (2013) 56 Cal.4th 545, 554 . . . ['A structural error requires per se reversal because it cannot be fairly determined how a trial would have been resolved if the grave error had not occurred.']; *Sandquist v. Lebo Automotive, Inc.* (2016) 1 Cal.5th 233, 261 . . . [finding error 'reversible per se' because its 'effects are "unmeasurable"' and "'def[y] analysis by "harmless-error" standards"'].)" (*Monier, supra*, 3 Cal.5th at p. 1108.)

"[T]he defining feature of a structural error is that it 'affect[s] the framework within which the trial proceeds,' rather than being 'simply an error in the trial process itself.'" (*Weaver v. Massachusetts* (2017) 582 U.S. 286, 295 (*Weaver*).) "Examples of structural errors in the criminal context include the total deprivation of the right to counsel at trial, a biased judge, unlawful exclusion of members of the defendant's race from a grand jury, denial of the right to self-representation at trial, denial of the right to a public trial, and an erroneous reasonable doubt instruction to the jury." (*In re Enrique G.* (2006) 140 Cal.App.4th 676, 685.)

"'[C]ategorization of an error as structural represents "the exception and not the rule."' [Citation.] '[A] strong presumption' exists *against* finding that an error falls within the structural category, and 'it will be the rare case' where an error—even 'a constitutional violation'—'will not be subject to harmless error analysis.'" (*Monier, supra*, 3 Cal.5th at p. 1108.)

The United States or California Supreme Court ordinarily decides whether an error is structural. Except for the RJA, I am aware of no instance in the history of California law where the

3

Legislature has purported to define what constitutes structural error.

The violation here of the RJA cannot be characterized as a structural error or defect. It did not "'affect[] the framework within which the trial proceed[ed]' . . . " (*Weaver, supra*, 582 U.S. at p. 295.) It was "'simply an error in the trial process itself.'" (*Ibid*.) "The effect of this form of error can be quantitatively assessed in light of the evidence to determine whether the error was prejudicial or harmless." (*Breverman, supra*, 19 Cal.4th at p. 174.) There is no doubt that any violation of the RJA is harmless in this case. The majority does not opine on this issue which surely lurks below the surface of its opinion.

The prosecutor's violation of the RJA may be characterized as a form of misconduct. "California appellate courts have repeatedly recognized that even flagrant misconduct by a prosecutor does not relieve them of their obligation to ascertain whether the misconduct resulted in a miscarriage of justice within the meaning of article VI, section 13, of the California Constitution." (*People v. Luparello* (1986) 187 Cal.App.3d 410, 427.) "Whatever methods a trial or appellate court might otherwise use to bring to heel a recalcitrant or incorrigible prosecutor, the federal Constitution does not require (and *the state Constitution does not permit*) the reversal of a criminal conviction unless the misconduct deprived defendant of a fair trial or resulted in a miscarriage of justice." (*People v. Hinton* (2006) 37 Cal.4th 839, 865, italics added.)

The majority opinion notes, "The Legislature's stated intent in adopting the RJA was 'to eliminate racial bias from California's criminal justice system because *racism in any form or amount*, at any stage of a criminal trial . . . *is a miscarriage of*

4

*justice under Article VI of the California Constitution* and violates the laws and Constitution of the State of California.' (Assem. Bill No. 2542, § 2, subd. (i), italics added.)" (Maj. opn., *ante*, at pp. 17-18.) But by mandating that "racism in any form or amount . . . is a miscarriage of justice under Article VI," the Legislature usurped the judiciary's authority to determine what constitutes "a miscarriage of justice" within the meaning of Article VI. Section 13 provides that a judgment shall not be reversed "unless . . . *the court* [not the Legislature] shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Italics added.) The Legislature's usurpation of this judicial function violated the separation of powers clause of the California Constitution, which provides, "The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution." (Cal. Const., Art. III, § 3.)

"The separation of powers doctrine limits the authority of one of the three branches of government to arrogate to itself the core functions of another branch. [Citations.] "The courts have long recognized that [the] primary purpose [of the separation-of-powers doctrine] is to prevent the combination in the hands of a single person or group of the basic or fundamental powers of government."' [Citations.] To serve this purpose, courts "have not hesitated to strike down provisions of law that either accrete to a single Branch powers more appropriately diffused among separate Branches or that undermine the authority and independence of one or another coordinate Branch."'" (*Carmel Valley Fire Protection Dist. v. State of California* (2001) 25 Cal.4th 287, 297 (*Carmel Valley Fire*).)

"The founders of our republic viewed the legislature as the branch most likely to encroach upon the power of the other branches. [Citations.] The principle of separation of powers limits any such tendency. . . . [I]t prohibits the legislative branch from arrogating to itself core functions of the executive or judicial branch." (*Carmel Valley Fire*, *supra*, 25 Cal.4th at p. 298.)

A core function of the judicial branch is to interpret the California Constitution, including section 13. It is a "well-established jurisprudential principle that, 'The judiciary, from the very nature of its powers and means given it by the Constitution, must possess the right to construe the Constitution in the last resort . . . .' (*Nogues v. Douglass* (185[7]) 7 Cal. 65, []70; see also *Marbury v. Madison* (1803) 5 U.S. (1 Cranch) 137, 176, [2 L.Ed. 60 . . .] [[in a unanimous decision Chief Justice John Marshall wrote that] interpreting and applying the Constitution is 'the very essence of judicial power']; [Citation.])" (*Raven v. Deukmejian* (1990) 52 Cal.3d 336, 354 (*Raven*).) "It would be idle to make the Constitution the supreme law, and then require the judges to take the oath to support it, and after all that, require the Courts to take the legislative construction as correct." (*Nogues v. Douglass*, *supra*, 7 Cal. at p. 70; see also *Legislature v. Eu* (1991) 54 Cal.3d 492, 509 ["*Raven*[, *supra*, 52 Cal.3d at pp. 352-355] . . . invalidated a portion of Proposition 115 because it deprived the state judiciary of its foundational power to decide cases by independently interpreting provisions of the state Constitution"]; *Breverman*, *supra*, 19 Cal.4th at p. 178, fn. 26 ["the meaning of the . . . California Constitution (art. VI, § 13), [is] a matter on which we are the final arbiter"].)

"'[T]he [L]egislature may put reasonable restrictions upon constitutional functions of the courts *provided they do not defeat*

6

*or materially impair the exercise of those functions.'"* (*Superior Court v. County of Mendocino* (1996) 13 Cal.4th 45, 58.) The courts' core function to interpret the California Constitution is defeated *and* materially impaired by the Legislature's direction that a violation of the RJA constitutes a miscarriage of justice within the meaning of section 13. We have been applying the "miscarriage of justice" constitutional rule for at least the last one hundred years. The application of this rule involves the exercise of judgment by appellate court justices based upon their legal knowledge and experience. The Legislature has no comparable knowledge or experience. It is ill-equipped to dictate how we should perform our judicial functions.

In addition to violating the separation of powers clause, the Legislature has created a statutory scheme that will waste scarce judicial resources and undermine the public's confidence in the fairness of our criminal justice system. Defense counsel will scour trial transcripts in search of the new and magical reversal ticket: "During the defendant's trial, . . . the judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror, used racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful." (Pen. Code, § 745, subd. (a)(2).) If judgment was entered after January 1, 2021, and counsel discovers such language or such an exhibition of "bias or animus," counsel may be able to obtain a reversal of the defendant's conviction even if the violation of the RJA was innocuous and the evidence of the defendant's guilt was overwhelming. (Pen. Code, § 745, subd. (e)(2)(A).)

7

As Justice Peters said over fifty years ago: "Our courts are not gambling halls but forums for the discovery of truth." (*People v. St. Martin* (1970) 1 Cal.3d 524, 533.) Here, a jury determined the truth of the charges against appellant. The jury's acquittal of appellant on a second count of attempted murder indicates it was not swayed by the prosecutor's use of "[r]acially discriminatory language." (Maj. opn., *ante*, at p. 15.)

"A defendant is entitled to a fair trial, but not a perfect one." (*Lutwak v. United States* (1953) 344 U.S. 604, 619.) Appellant was convicted not because of racial bias or discrimination, but because he attempted to murder his drug supplier for failing to deliver the marijuana he had purchased. There is no reason to believe that the offense was not committed or that the victim was mistaken in his identification of appellant. Accordingly, the prosecutor's comment about "appellant's complexion and 'ambiguous ethnic presentation'" (Maj. opn., *ante*, at p. 21) did not result in "a miscarriage of justice" as that term has been construed by the courts. The People, witnesses, and the trial court should not be subjected to the expense, delay, and burden of a retrial.

In enacting the RJA, the Legislature's goal was "to eliminate racial bias from California's criminal justice system," "to ensure that race plays no role at all in seeking or obtaining convictions or in sentencing," and "to provide remedies that will eliminate racially discriminatory practices in the criminal justice system . . . ." (Stats. 2020, ch. 317, § 2, subds. (i), (j).) The Legislature's goal is laudable, but to achieve that goal it has resorted to an extreme unconstitutional measure that may wreak havoc on the criminal justice system.

8

I agree with Chief Justice John Marshall that "[i]t is emphatically the province and duty of the judicial department to say what the [constitutional] law is." (*Marbury v. Madison*, *supra*, 5 U.S., at p. 177.) It is therefore also emphatically the province and duty of the judiciary, *not the Legislature,* to determine what constitutes a "miscarriage of justice" within the meaning of section 13. The Legislature cannot dismantle California's separation of powers doctrine by dictating to the judiciary how the California Constitution should be construed.

<u>CERTIFIED FOR PUBLICATION</u>.


YEGAN, J.

David V. Herriford, Judge

Superior Court County of Los Angeles

_____

John Lanahan for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sillivan Pithey, Assistant Attorney General, Scott A. Taryle, Idan Ivri, Stephanie C. Santoro and Blythe J. Leszkay, Deputy Attorneys General, for Plaintiff and Respondent.